## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

PRECIOUS SEGUIN, ET AL.                    CIVIL ACTION

VERSUS                                     NO. 14-2442

REMINGTON ARMS COMPANY, LLC, ET AL.        SECTION "B"(2)

### ORDER AND REASONS

Before the Court are cross-motions for summary judgment filed by Plaintiff Precious Seguin ("Precious" or "Plaintiff") and Defendant Remington Arms Company, LLC ("Remington" or "Defendant"). Rec. Docs. 151, 152. Both parties timely filed opposition memoranda. Rec. Docs. 154-1, 155. For the reasons discussed below,

**IT IS ORDERED** that Plaintiff's motion for summary judgment (Rec. Doc. 151) is **GRANTED;**

**IT IS FURTHER ORDERED** that Defendant's cross-motion for summary judgment (Rec. Doc. 152) is **DENIED.**

### I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As previously discussed, this case arises out of a tragic hunting accident in which Precious suffered significant injuries. On October 28, 2013, at approximately 10:00 p.m., Precious went out into the woods near Loranger, Louisiana with her father, James Seguin, Jr. ("J.R."), her brother, James Seguin, III ("Bubba"), and a family friend, Matthew Perilloux ("Perilloux"), to hunt a wounded deer. *See* Rec. Docs. 150 at 1; 53-3 at 2; 61-3 at 1-2.

1

J.R. was carrying a Remington Model 710 bolt-action rifle ("the rifle"). Rec. Doc. 150 at 1. The party moved through the woods in a single file in the following order: Perilloux, J.R., Precious, and then Bubba. Rec. Docs. 53-3 at 3; 61-3 at 2. Plaintiff maintains that, at one point, she bent over, facing the opposite direction of the group, to look for a blood trail. Rec. Doc. 61-3 at 2. The rifle, then pointed in Plaintiff's direction, discharged and struck Plaintiff in the right buttocks, traveling through her hip and exiting through her right elbow. *Id.* at 3; *see also* Rec. Doc. 150 at 1.

On October 24, 2014, Precious, J.R., Bubba, and Precious's mother, Joy, filed suit against Remington, Sporting Goods Properties, Inc. ("SPS"), and E.I. du Pont de Nemours and Company ("E.I"). Rec. Doc. 1. Plaintiffs amended their complaint, naming Remington as the sole defendant. Rec. Doc. 8. They then voluntarily dismissed SPS and E.I. Rec. Doc. 13. On July 5, 2016, this Court granted Plaintiffs' unopposed motion to dismiss with prejudice all claims brought by Joy, J.R., and Bubba. Rec. Doc. 125. The only remaining claim is Precious's products liability claim against Remington.

During a telephone status conference on March 21, 2017, counsel for both parties informed the Court that they would like to submit cross-motions for summary judgment instead of proceeding to trial. Rec. Doc. 146. After an extension, the parties filed the

instant motions. Rec. Docs. 151, 152. The only issue before the Court is whether or not Plaintiff may assert and recover on a claim for design defect under the Louisiana Products Liability Act ("LPLA"). Rec. Doc. 150 at 2 (citing La. Rev. Stat. Ann. §§ 9:2800.56, 9:2800.60). If the Court finds that Plaintiff may assert and recover on such a claim, then, pursuant to the parties' stipulations, judgment is to be entered in Plaintiff's favor in the amount of $500,000; otherwise, judgment is to be entered in Defendant's favor, dismissing all claims with prejudice. Rec. Docs. 150 at 2-3; 152-1 at 2. Oral arguments on the motions were received by teleconference on Friday, May 12, 2017 at 9:00 a.m. with parties' counsel. *See* Rec. Doc. 149.

## II.   **PARTIES' CONTENTIONS**

Plaintiff argues that "[t]he decision before this [C]ourt is whether any firearm, irrespective of how horrific the design, can ever be the subject of a § 9:2800.60 claim." Rec. Doc. 151-1 at 1. In other words, assuming that Plaintiff could demonstrate a design defect under § 9:2800.56, this Court must determine whether or not § 9:2800.60(B) prohibits Plaintiff from bringing such a claim against Defendant.

Even though the issue is not before the Court, we will briefly describe Plaintiff's allegation that the rifle's "Walker fire

control mechanism" is defectively designed.[1] *See* Rec. Doc. 151-1 at 2. According to Plaintiff, the mechanism uses a "connector" that "floats on top of the trigger inside of the gun . . . ." *Id.* at 3. "When the trigger is pulled, the connector is pushed forward . . . allowing the sear to fall and fire the rifle." *Id.* Before the trigger is pulled, the connector and sear overlap only slightly, by about 25/1000ths of an inch. *Id.* at 4. Because the connector is not bound to the trigger, it allegedly separates from the trigger during the recoil after each firing. *Id.* Dirt, debris, and manufacturing scrap can then become lodged between the connector and the trigger. *Id.* If too much debris accumulates, the connector will no longer be able to support the sear. *Id.* at 5. The rifle may then fire without the trigger being pulled if the rifle is jarred or dropped, when the safety is released, or when the bolt is open or closed. *Id.*[2] According to Plaintiff, "[t]here have been over 4,000 documented complaints of unintended discharge

---

[1] Defendant maintains that Plaintiff's description of the alleged design defect is "not only irrelevant . . . [but] inaccurate." Rec. Doc. 155 at 2. It specifically notes that the rifle never accidentally discharged either before or after the incident; independent testing showed that the rifle could only be fired by pulling the trigger; the Louisiana Department of Wildlife and Fisheries concluded that the trigger either caught on an object and/or the accident was caused by reckless handling of the rifle; and J.R. told law enforcement that a tree branch pulled the trigger. *Id.* at 2-3 (citations omitted). Defendant's arguments are noted by the Court. Nonetheless, the Court will summarize Plaintiff's allegations. Whether or not the rifle was defectively designed is not an issue presently before this Court and the Court makes no determination as to this issue.

[2] Remington purportedly created acronyms for these misfirings: "FBC" stands for fire on bolt closure, "FBO" for fire on bolt opening, "FSR" for fire on safe release, and "JO" for jar-off. Rec. Doc. 151-1 at 5.

with respect to" the Model 710 rifle and its predecessor, the Model 700. *Id.* at 2.[3]

Assuming Plaintiff could demonstrate a design defect, Defendant argues that recovery is precluded by § 9:2800.60(B). Rec. Doc. 152-1 at 1. Plaintiff maintains that this statute is ambiguous and, if applied literally, would lead to an absurd result. Rec. Doc. 154-1 at 2.

---

[3] The Eighth Circuit noted in 2015 that "[t]he Walker trigger, as designed, allows the connector and trigger to separate when the rifle is fired, creating the possibility of foreign material getting trapped between the trigger and connecter, which misaligns the connector by pushing it forward. This, coupled with the already minute engagement point between the sear and the connector, can result in a Model 700 rifle discharging without the trigger being pulled when the connector is misaligned by as little as 1/100th of an inch, or the thickness of 2 ½ pieces of standard copy paper. Moreover, the Walker trigger hides this latent defect inside a riveted housing unit which interferes with a user's ability to clean the interior parts to remove the presence of foreign materials, or to visually inspect the parts to determine whether the connector has become misaligned and has an insufficient engagement with the sear. All of this makes it very difficult to prevent an inadvertent discharge from occurring in a Model 700 rifle; more significantly, it makes it very difficult to predict when an inadvertent discharge caused by this design defect may occur." *O'Neal v. Remington Arms Co.*, 817 F.3d 1055, 1060-61 (8th Cir. 2015). In that case, Remington "acknowledged that at least 20,000 rifles it manufactured prior to 1975 were susceptible to inadvertent discharges when the safety lever was moved from the safe position to the fire position without the trigger being pulled." *Id.* Ultimately, the court concluded that "a rifle originally manufactured in this condition, which allows for the possibility of the rifle discharging without pulling the trigger, is defective and not fit for its ordinary purpose." *Id.* at 1061 (citations omitted). The case was remanded to the district court to determine whether or not the defect existed when it left the manufacturer. *Id.* at 1063. Defendant notes that the court in *O'Neal* considered a Model 700 rifle manufactured prior to 1975, while the instant case involves a Model 710 rifle manufactured in 2003. Rec. Doc. 155 at 12 (citations omitted). Again, Plaintiff's description of the alleged design defect and the materials she cites in support of those allegations, including *O'Neal*, are reproduced here only to provide a better understanding of the underlying claim. The Court withholds judgment as to whether or not the rifle at issue was defectively designed.

## III. LAW AND ANALYSIS

### A. APPLICABLE LAW

#### 1. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). *See also TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the movant must point to "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If and when the movant carries this burden, the non-movant must then go beyond the pleadings and present other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Though, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus

shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). Conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

However, where the parties "seek summary judgment solely on a question of law, the usual rules about burden-shifting and whether a genuine issue of material fact exists do not apply." *Weeks Tractor & Supply Co., LLC v. Arctic Cat Inc.*, 784 F. Supp. 2d 642, 646 (W.D. La. 2011) (citing *Anderson*, 477 U.S. at 249-50).

### 2. THE LPLA

The LPLA provides "the exclusive theories of liability for manufacturers for damage caused by their products." LA. REV. STAT. ANN. § 9:2800.52. It establishes four theories of liability: (1) a manufacturing defect under § 9:2800.55; (2) a design defect under § 9:2800.56; (3) failure to adequately warn under § 9:2800.57; and (4) failure to conform to a manufacturer's express warranty under § 9:2800.58. LA. REV. STAT. ANN. § 9:2800.54. Nevertheless, the question before this Court is whether or not § 9:2800.60, enacted by the Louisiana legislature in 1999, bars Plaintiff's design defect claim against Defendant. This section, titled "Liability of manufacturers and sellers of firearms," provides in full:

A.   The legislature finds and declares that the Louisiana Products Liability Act was not designed to impose liability on a manufacturer or seller for the improper use of a properly designed and manufactured product. The legislature further finds and declares that the manufacture and sale of firearms and ammunition by manufacturers and dealers, duly licensed by the appropriate federal and state authorities, is lawful activity and is not unreasonably dangerous.

B.   No firearm manufacturer or seller shall be liable for any injury, damage, or death resulting from any shooting injury by any other person unless the claimant proves and shows that such injury, damage, or death was proximately caused by the unreasonably dangerous construction or composition of the product as provided in R.S. 9:2800.55.

C.   Notwithstanding any other provision of law to the contrary, no manufacturer or seller of a firearm who has transferred that firearm in compliance with federal and state law shall incur any liability for any action of any person who uses a firearm in a manner which is unlawful, negligent, or otherwise inconsistent with the purposes for which it was intended.

D.   The failure of a manufacturer or seller to insure that a firearm has a device which would:  make the firearm useable only by the lawful owner or authorized user of the firearm; indicate to users that a cartridge is in the chamber of the firearm; or prevent the firearm from firing if the ammunition magazine is removed, shall not make the firearm unreasonably dangerous, unless such device is required by federal or state statute or regulation.

E.   (1) For the purposes of this Chapter, the potential of a firearm to cause serious injury, damage, or death as a result of normal function does not constitute a firearm malfunction due to a defect in design or manufacture.

(2) A firearm may not be deemed defective in design or manufacture on the basis of its potential to cause serious bodily injury, property damage, or death when discharged legally or illegally.

F.  Notwithstanding any provision of law to the contrary, no manufacturer or seller of a firearm shall incur any liability for failing to warn users of the risk that:

(1)  A firearm has the potential to cause serious bodily injury, property damage, or death when discharged legally or illegally.

(2)  An unauthorized person could gain access to the firearm.

(3)  A cartridge may be in the chamber of the firearm.

(4)  The firearm is capable of being fired even with the ammunition magazine removed.

G.  The provisions of this Section shall not apply to assault weapons manufactured in violation of 18 U.S.C. § 922(v).

LA. REV. STAT. ANN. § 9:2800.60. No Louisiana court has addressed the scope or proper interpretation of this statute.[4] The correct interpretation of subsection (B) is at issue here.

### 3. STATUTORY INTERPRETATION

"A federal court sitting in diversity applies state substantive law, including the state's . . . method of statutory interpretation." *Weeks Tractor*, 784 F. Supp. 2d at 647 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Keenan v.*

---

[4] In *Morial v. Smith & Wesson Corporation*, the Louisiana Supreme Court vacated and set aside the trial court's determination that § 9:2800.60 was unconstitutional. 00-1132, p. 26 (La. 4/3/01); 785 So. 2d 1, 19. Because the Supreme Court determined that the defendants' exception of no right of action should be granted in light of Louisiana Revised Statute § 40:1799, thereby dismissing the plaintiffs' action, the Court did not have to directly address the constitutionality of § 9:2800.60. *Id.*

*Donaldson, Lufkin & Jenrette, Inc.*, 529 F.3d 569, 572 (5th Cir. 2008)).

> To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court. In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes.

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (citations omitted).

Pursuant to Louisiana Civil Code article 9, "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA. CIV. CODE ANN. art. 9. In other words, a court's inquiry stops "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

On the other hand, when a statute is ambiguous, meaning "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." LA. CIV. CODE ANN. art. 10. To interpret a statute, courts must "ascertain and enforce the intent

of the Legislature in enacting the statute." *Sultana Corp. v. Jewelers Mut. Ins. Co.*, 03-0360, p. 3 (La. 12/3/03); 860 So. 2d 1112, 1115 (citing *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 00-1695, p. 11 (La. 6/29/01); 808 So. 2d 294, 302 (citing *Stogner v. Stogner*, 98-3044, p. 5 (La. 7/7/99); 739 So. 2d 762, 766; *State v. Piazza*, 596 So. 2d 817, 819 (La. 1992))). A law's meaning "is determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker enacting it." *Sultana Corp.*, 860 So. 2d at 1116 (citing *In re Succession of Boyter*, 99-0761, p. 9 (La. 1/7/00); 756 So.2d 1122, 1129; *Stogner*, 739 So. 2d at 766).

"Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided" and courts must presume "that every word, sentence or provision in a statute was intended to serve some useful purpose, that some effect be given to each such provision, and that the Legislature used no unnecessary words or provisions." *Sultana Corp.*, 860 So. 2d at 1116, 1119 (citing *Langlois v. E. Baton Rouge Par. Sch. Bd.*, 99-2007, p. 5 (La. 5/16/00); 761 So. 2d 504, 507; *Boyter*, 756 So. 2d at 1129; *Bunch v. Town of St. Francisville*, 446 So. 2d 1357, 1360 (La. App. 1 Cir. 1984)); *see also City of New Orleans v. La.*

*Assessors' Ret. & Relief Fund*, 05-2548, p. 20 (La. 10/1/07); 986 So. 2d 1, 17, *on reh'g* (Jan. 7, 2008) ("courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found") (citations omitted).

Ultimately, "where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result." *Sultana Corp.*, 860 So. 2d at 1116 (quoting *First Nat'l Bank of Boston v. Beckwith Mach. Co.*, 94-2065, p. 8 (La. 2/20/95); 650 So. 2d 1148, 1153 (quoting *Smith v. Flournoy*, 115 So. 2d 809, 814 (La. 1959))).

Nonetheless, "[t]he starting point in the interpretation of any statute is the language of the statute itself." *Sultana Corp.*, 860 So. 2d at 1116 (citing *Touchard v. Williams*, 617 So. 2d 885, 888 (La. 1993)).

Accordingly, the exact language of § 9:2800.60(B) bears repeating:

> No firearm manufacturer or seller shall be liable for any injury, damage, or death resulting from any shooting injury by any other person unless the claimant proves and shows that such injury, damage, or death was proximately caused by the unreasonably dangerous construction or composition of the product as provided in R.S. 9:2800.55.[5]

[5] "A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in

**B. ANALYSIS**

**1. IS SUBSECTION (B) AMBIGUOUS?**

If subsection (B) is read literally, Plaintiff maintains that other sections of the statute would be rendered superfluous. Rec. Doc. 151-1 at 13-15 (arguing that references to design defect claims and failure to warn claims would be rendered meaningless; subsection (C), which provides that manufacturers who have transferred a firearm shall not be liable for the actions of a person who uses the firearm in an unlawful or negligent manner, would be superfluous because that type of liability would never arise from the unreasonably dangerous construction or composition of a firearm; subsection (D), which "precludes claims for certain design decisions," would be superfluous if subsection (B) already precluded all design defect claims; subsection (E) explicitly refers to design defect claims; and subsection (F) explicitly refers to failure to warn claims).

Defendant responds that subsection (B) applies only in situations in which a person is <u>shot by a third party</u>, while the remaining subsections apply to different or broader circumstances. Rec. Doc. 155 at 9. For example, Defendant argues that subsection (C) applies only to situations in which a firearm is "transferred"

---

a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." LA. REV. STAT. ANN. § 9:2800.55.

by a gun manufacturer or seller and is therefore intended to preclude "negligent entrustment claims against manufacturers and sellers of firearms where the sale was authorized by law." *Id.* Defendant further argues that subsections (D), (E), and (F) limit claims "in **all** types of firearms cases, regardless of the specific factual circumstances at issue. For example, if the injured party shot herself . . . ." *Id.* at 10-11 (emphasis in original).

A statute is ambiguous if it is reasonably susceptible to two or more interpretations. *See* LA. CIV. CODE ANN. art. 10. Here, Defendant argues that subsection (B) applies only in situations in which a potential plaintiff is shot and injured by a third person, because the subsection provides that firearm manufacturers and sellers shall not be liable for any injury "resulting from any shooting injury by any other person unless . . . ." § 9:2800.60(B) (emphasis added). However, this language may reasonably be interpreted in two ways. First, in accordance with Defendant's interpretation, the language may limit subsection (B) to situations in which the potential plaintiff is shot by someone "other" than the manufacturer, seller, or him or herself. Alternatively, the language may limit subsection (B) to situations in which the potential plaintiff is shot by someone "other" than the manufacturer or seller. If Defendant's interpretation is used, then other subsections may not be superfluous—they would simply apply to a different or broader set of factual circumstances. If

the latter interpretation is used, then Plaintiff is arguably correct that other subsections are rendered superfluous. In any event, because the "other" language in subsection (B) may reasonably be interpreted in two or more ways, it is ambiguous.

## 2. DOES A LITERAL INTERPRETATION OF SUBSECTION (B) LEAD TO AN ABSURD RESULT?

Because subsection (B) is ambiguous, the Court may consider legislative intent without determining whether or not a literal interpretation would lead to absurd consequences. Nonetheless, because this argument may help the Court to decipher the legislative intent, it will be considered here. Plaintiff maintains that a literal interpretation would lead to an absurd result because it would allow manufacturing defect claims, "which are likely to affect only a small percentage of firearms, while precluding design defect and failure to warn claims that are likely to affect a greater number of firearms and endanger a significantly larger number of people." Rec. Doc. 151-1 at 17. In other words, "no matter how poorly a firearm is designed," an injured person could not bring a cause of action against the manufacturer if the firearm met the manufacturer's specifications. *Id.* at 19. Plaintiff summarizes, "[t]he legislature intended to protect firearm manufacturers and sellers from claims based on *the improper use of a properly designed and manufactured firearm*, not the *proper*

use of an improperly designed and manufactured firearm." *Id.* at 17 (emphasis in original).

Defendant responds that limiting claims arising from a third-person shooting does not lead to an absurd or unreasonable outcome. Rec. Doc. 155 at 6.

> All too often when one person handling a firearm shoots another, the gun-handler claims that the firearm accidentally discharged or that the trigger was not pulled. That is true even where, as in this case, the post-incident inspections and testing by both retained and **independent** firearm experts yield the same result, *i.e.*, that the firearm would **only** fire when the trigger was pulled. Without the limitation of [sub-section (B)], however, the injured party would be undeterred from filing a product liability lawsuit against the manufacturer alleging that a "design defect" was somehow responsible for her injury.

*Id.* (emphasis in original). Defendant continues, "if a design defect claim were to be accepted by a jury (even though the alleged accidental discharge with the firearm could not be replicated), the result would essentially impose regulation prohibiting an otherwise permissible design of the firearm—*i.e.*, piecemeal regulation that circumvents the legislative process." *Id.* at 7 n.5. Plus, Defendant maintains that if a claim against the manufacturer is barred by subsection (B), the injured party may nevertheless pursue the person who negligently handled the gun. *Id.* at 7 n.6.

Despite Plaintiff's argument, it is possible that the Louisiana legislature would want to dramatically restrict the

types of claims that could be brought against gun manufacturers and sellers. If Defendant's interpretation of subsection (B) is adopted, the statute would not bar all design defect and failure to warn claims, as Plaintiff fears. However, if the alternative interpretation is used, such claims would be precluded in all situations.

Defendant's reasoning, reproduced in the block quotation above, is nevertheless flawed. Defendant argues that precluding these claims when a third-person shooter is involved is reasonable because the third-person shooter will often claim that the gun accidentally discharged. Is it not just as likely that a potential plaintiff who shot him or herself would also claim that the gun accidentally discharged? In fact, would he or she not be more likely to make that argument simply because he or she would want to hold someone else liable? If so, why would the legislature only preclude these types of claims when a third-person shooter is involved? Would it not be just as reasonable to assume, based on Defendant's reasoning, that the legislature would preclude these claims in all situations? In other words, would the legislature not have used the alternative interpretation of subsection (B), the interpretation assumed by Plaintiff and that may render the remaining provisions of § 9:2800.60 superfluous?

There are also problems with Defendant's argument that an injured person whose product liability claims are barred by

subsection (B) may nevertheless pursue the shooter for negligence. If a gun was defectively designed and actually discharged accidentally, or if the shooter properly handled the weapon but was unaware of some risk because of the manufacturer's failure to adequately warn, would the injured person succeed in a suit against the shooter? Defendant's argument is based on the false premise that a gun never discharges accidentally unless it was negligently handled by the shooter.[6] The Court declines to accept that premise.

Ultimately, if the Court rejects Defendant's interpretation of subsection (B), and even if the Court accepts that interpretation, a literal application of the statute could lead to absurd results. Before making that determination, however, the Court will consider the legislative intent and history of § 9:2800.60.

### 3. WHAT WAS THE LEGISLATIVE INTENT, AS EVIDENCED BY SUBSECTION (A)?

According to Plaintiff, the statute was intended only to preclude claims against firearm manufacturers for "properly" designed firearms, but to allow claims when firearms are unreasonably dangerous, as prescribed by the LPLA. Rec. Doc. 151-1 at 8. (citing § 9:2800.60(A)).

---

[6] In fact, defense counsel essentially made this argument during closing arguments when he stated that virtually every injury could be prevented if gun handlers abided by the general rules of gun safety. Notably, defense counsel did not argue that all injuries could be so prevented.

Defendant responds that subsection (A), the "general preamble," does not preclude application of the more specific subsection (B). Rec. Doc. 155 at 8.

According to general rules of statutory interpretation, "if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character." *Oubre v. La. Citizens Fair Plan*, 11-97, p. 12 (La. 12/16/11); 79 So. 3d 987, 997 (citations omitted). Further, "[i]t is a cardinal rule of statutory construction that the preamble of an act of the legislature is not part of the law, and it cannot be utilized to discern the intent of the legislature where no doubt exists as to the meaning of the statute." *State v. Barbier*, 98-2923, p. 5 (La. 9/8/99); 743 So. 2d 1236, 1239 (citations omitted) (emphasis added).

Because subsection (B) is ambiguous (i.e. "doubt exists" as to its meaning), the Court may consider subsection (A), the "general preamble," to determine legislative intent. Plus, even though subsection (B) is more specific than subsection (A), regardless of the interpretation ultimately adopted by the Court, subsection (A) may help the Court determine which interpretation was intended.

Pursuant to subsection (A), the LPLA was not intended "to impose liability on a manufacturer or seller for the improper use of a properly designed and manufactured product." This sentence

suggests that the statute is merely clarifying that when a gun is "properly designed and manufactured," a person injured by a gun may not sue the manufacturer or seller for his or her injuries. Thus, the sentence suggests that the legislature did <u>not</u> intend to preclude liability when a gun is <u>not</u> "properly designed and manufactured." However, the second sentence of subsection (A) undermines this intent. In it, the legislature "declares that the manufacture and sale of firearms and ammunition by manufacturers and dealers, duly licensed by the appropriate federal and state authorities, is lawful activity <u>and is not unreasonably dangerous</u>." § 9:2800.60(A) (emphasis added). Read literally, this sentence provides that, as long as a gun manufacturer or seller is properly licensed, then the manufacture and sale of firearms is not unreasonably dangerous, i.e. does not expose the manufacturer or seller to liability under the LPLA. *See* § 9:2800.54(A) ("the manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product <u>unreasonably dangerous</u> when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity") (emphasis added). If that was the legislature's intent, though, the rest of § 9:2800.60 would be superfluous—it would be unnecessary to specifically limit the scope of the LPLA as to gun manufacturers and sellers if the intent was to entirely preclude application of the LPLA to these actors.

It would be more reasonable to assume that the legislature intended to say that the manufacture and sale of firearms by those duly licensed, <u>in and of itself</u>, is not unreasonably dangerous. In any event, because there are two or more reasonable interpretations, the meaning of subsection (A) is also ambiguous.

### 4. WHAT IS THE LEGISLATIVE HISTORY?

Section 9:2800.60 was originally introduced as House Bill 1639 on March 29, 1999. OFFICIAL JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE STATE OF LOUISIANA, *First Day's Proceedings*, p. 181 (March 29, 1999).[7] On April 8, 1999, the House voted overwhelmingly to pass an amended version of the bill. *Id.* at *Eighth Day's Proceedings*, p. 376.

The bill was introduced to the Louisiana Senate and referred to the Committee on Judiciary A on April 12, 1999. LOUISIANA STATE SENATE, *Daily Journals for the 1999 Regular Session*, April 12, 1999, at pp. 5, 13.[8] On May 18, 1999, the Judiciary Committee reported the bill favorably. *Id.* at May 18, 1999, p. 44.[9] During this meeting, the following exchange took place:

> Senator [John] Hainkel asked Senator Jay Dardenne, "In regards to Section B, would you see if it would do any damage to put a defective design exclusion? I would like to have your comments before it comes before the full

---

[7] These documents are *available at* http://house.louisiana.gov/H_Journals/H_Journals_All/1999_Journals/1999_RSJournals.htm.

[8] These documents are *available at* http://senate.la.gov/sessioninfo/Journals/1999/.

[9] Defendant provided the minutes from this meeting to the Court. *See* Rec. Doc. 155-1.

senate." Senator Dardenne agreed to do so and said, "I think that we ought to have to try and preserve causes of action that might be appropriate for malfunctions."

Rec. Doc. 155-1 at 7.

On June 14, 1999, through floor amendments, subsection (B) was recommended and rejected. *Senate Journals*, at June 14, 1999, p. 12. Eventually, the bill was passed. *Id.* at p. 14. However, on June 20, 1999, the House refused to concur in the amendments; it further recommended that House and Senate committees confer on the matter. *Id.* at June 20, 1999, p. 5. The Senate appointed a committee the same day. *Id.* at p. 73. The following day, the committee recommended that certain amendments, including the amendment adding subsection (B), be adopted. *Id.* at June 21, 1999, p. 19.[10] Ultimately, the bill was passed in its current form.

The exchange between Senators Hainkel and Dardenne demonstrates that the legislature considered excluding design defect claims under subsection (B). The fact that the legislature considered excluding these claims and ultimately passed legislation that may reasonably be interpreted in a way to exclude these claims is persuasive evidence that the legislature intended to exclude these claims.

Assuming that the legislature so intended, this Court must determine if subsection (B) is properly interpreted to apply to

---

[10] After inquiring with the Louisiana State Senate, the Court was informed that conference committee notes, minutes, or recordings from this June 1999 meeting are not available.

all claims arising from a shooting or to only those claims arising from a third-person shooting. While the former interpretation seems more likely to the Court, based on a logical reading of the paragraph and the fact that the legislature did not say "injury by any third person" instead of "injury by any other person," this interpretation would render other subsections superfluous. Of course, this Court "should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided." *Sultana Corp.*, 860 So. 2d at 1116 (citations omitted). The interpretation offered by Defendant does not render the remainder of the statute superfluous.

So, assuming that the legislature intended to exclude design defect claims under subsection (B) and that it would approve of Defendant's interpretation of that subsection, we must now consider whether or not the subsection produces absurd results.

Recently, the Louisiana Supreme Court determined that, even though the language included in part of the Louisiana Administrative Code was not ambiguous *per se*, the interpretation adopted by the lower court produced an absurd consequence and therefore could not be maintained. *Gulley v. Hope Youth Ranch*, 16-1112, p. 6 (La. 3/15/17); 2017 WL 1034494, at *10. The Court was interpreting the following sentence: "The topography of pain and its underlying pathophysiology are amenable to stimulation coverage (the entire painful area has been covered) . . . ." *Id.*

at \*8 (quoting LA. ADMIN. CODE tit. 40, pt. I, § 2113). The Medical Director, Office of Workers' Compensation, and lower court interpreted the sentence to mean that stimulation therapy was available only if it would relieve "every bit" of the claimant's pain. *Id.* at \*9. That meant that in cases like the plaintiff's, where he suffered multiple injuries to different parts of his body, the therapy would be precluded. *Id.* at \*9-10. This was an absurd result, according to the Louisiana Supreme Court. *Id.* at \*10. Consequently, the Court found that the Office of Workers' Compensation hearing officer misapplied the language of the provision and reversed the lower court's ruling affirming the decision to deny the therapy to the plaintiff. *Id.* at \*11.

Here, application of subsection (B) using Defendant's interpretation leads to absurd consequences. Defendant offers no reasonable explanation, and this Court cannot imagine one, for limiting the design defect claims of a person injured by a third-party but allowing such claims if brought by a person who was injured by him or herself (or the manufacturer or seller, in the unlikely circumstance that the manufacturer or seller was also the shooter). If the goal was to limit frivolous claims against gun manufacturers and sellers, as Defendant claims, why would the legislature limit subsection (B) in this arbitrary way? During oral argument, defense counsel admitted that its preferred interpretation would lead to "inconsistent" results, but

nevertheless maintained that precluding all but manufacturing defect claims when a third-person shooter is involved was the legislature's decision and is not, in and of itself, absurd.

On the other hand, if the Court uses the alternative interpretation, which would effectively eliminate all but manufacturing defect claims against firearm manufacturers and sellers, then aspects of § 9:2800.60 would be rendered superfluous (particularly subsections (D), (E), and (F))

At the end of the day, under either interpretation, application of the statute would lead to absurd consequences. If a gun manufacturer designed a gun that routinely discharged accidentally, a person injured by a third party because of that defect would not be permitted to sue the manufacturer under the LPLA as long as the gun was manufactured according to the manufacturer's specifications. Those specifications could be designed by a three-year-old and the gun manufacturer could not be held liable. This is absurd.[11] *See, e.g. La. State Bd. of Med. Examiners v. Bertucci*, 593 So. 2d 798, 801 (La. Ct. App. 4th Cir. 1992) (finding absurd a party's interpretation of a statute to mean that as long as he could show that he was presently complying with the law, his medical license could not be revoked); *United*

---

[11] The Court recognizes that gun manufacturers and sellers are subject to various state and federal regulations and would likely be held responsible for any violation of those regulations. However, those regulations would provide no redress for the Louisiana citizen bound by the LPLA and injured because of a design defect.

*States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) ("even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed [the purpose of the legislation], rather than the literal words") (footnotes and citations omitted).

Therefore, neither interpretation makes sense.

"When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." LA. CIV. CODE ANN. art. 10. Subsection (A) and the committee minutes from May 18, 1999 indicate that § 9:2800.60 was designed to "make[] it clear" that the LPLA "was never designed to punish a manufacturer or seller for the improper use of a properly designed and manufactured product." Rec. Doc. 155-1 at 5. It was "aimed at making it real clear <u>in existing law</u> that product liability law was never intended for someone to come in and make additional regulations on guns and clearly never intended to make it possible for someone to sue a gun maker for [] making a legal product." *Id.* Senator Steve Scalise explained that "gun owners could still sue a gun manufacturer if a weapon is defective. But if someone misuses a gun and causes an accident, or uses a gun to commit a crime, the manufacturer should not be held responsible." *Id.* at 6. At no point during this discussion or in subsection (A), the "general preamble," did the

legislature state that the purpose of the law was to limit product liability claims against gun manufacturers and sellers to claims for manufacturing defect.

Granted, it was after the introduction of the legislation during the Senate Judiciary committee that Senator Hainkel asked Senator Dardenne about excluding design defect claims under subsection (B). *Id.* However, Senator Dardenne replied that they should "try and preserve causes of action that might be appropriate for malfunctions." *Id.* A "malfunction" is defined as both to "fail to operate in the normal or usual manner" (suggesting a manufacturing defect) and "to function imperfectly or badly" (suggesting a design defect). WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984). All we know is that subsection (B), though originally rejected as an amendment, was thereafter adopted and enacted as part of § 9:2800.60. Its adoption, however, presumably did not signal a change in the purpose of the law, reflected in subsection (A), merely to clarify existing law. That purpose is not furthered by precluding design defect claims against gun manufacturers. *See, e.g. McLane S., Inc. v. Bridges*, 11-1141, pp. 8-9 (La. 1/24/12); 84 So. 3d 479, 485 ("In order for a court to find a literal application results in 'absurd consequences,' 'there must be a determination by the court that the specific application at issue arising from the literal wording would, if judicially enforced, produce a factual result so inappropriate as to be deemed outside

27

the 'purpose' of the law.'") (quoting P. Raymond Lamonica and Jerry G. Jones, *20 Louisiana Civil Law Treatise: Legislative Law and Procedure*, § 7.4 (2011 ed.)). Therefore, Plaintiff may bring a § 9:2800.56 design defect claim against Defendant under § 9:2800.60(B).

New Orleans, Louisiana, this 16th day of May, 2017.

_____
SENIOR UNITED STATES DISTRICT JUDGE